**Affirmed and Memorandum Opinion filed May 28, 2015.**



In The

# Fourteenth Court of Appeals

### NO. 14-14-00322-CV

### CITY OF BRAZORIA, TEXAS, Appellant

### V.

### WALTER ELLIS, INDIVIDUALLY AND AS NEXT FRIEND OF CHRISTIAN ELLIS AND MAKAYLA ELLIS, MINORS, Appellee

**On Appeal from the 23rd District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 67298**

## MEMORANDUM OPINION

Nicholas Dayton, a police officer employed by appellant, the City of Brazoria, was involved in a traffic collision with appellee Walter Ellis. Officer Dayton was responding to a call for emergency assistance at the time of the collision. Ellis filed this negligence suit and the City responded by asserting its immunity in a plea to the jurisdiction, which the trial court denied.

In this interlocutory appeal, the City raises three issues in support of its contention that the trial court erred in denying the plea. First, the City argues that it is immune from liability because Officer Dayton is entitled to official immunity. Second, the City asserts it is immune from liability because Officer Dayton did not act with conscious indifference or reckless disregard for the safety of others while responding to the emergency call for assistance. We overrule these issues because there are genuine issues of material fact on whether Officer Dayton acted in good faith as required for official immunity, as well as whether his actions demonstrated a conscious indifference or reckless disregard for the safety of others. Because we overrule the City's first two issues, we need not reach its third issue in which the City argues it did not waive its immunity from suit by filing counterclaims against Ellis. We therefore affirm the trial court's order denying the City's plea to the jurisdiction.

## BACKGROUND

On the night of February 5, 2012, Officer Dayton had been working for the City's Police Department for approximately eight months. The Department had hired Dayton the same day he interviewed for the job. Dayton's job with the Department started about a month after he was hired. Dayton, who had no prior police training, was instructed to read the Department's policy manual before starting work but was not required to take any examination. Once Officer Dayton began working for the Department, he participated in six months of field training conducted by another police officer.

Officer Dayton went on duty at six o'clock in the evening on February 5, 2012. Officer Dayton testified that once he was on duty, he turned on his patrol car's camcorder unit, checked the remainder of the vehicle's equipment, and then began his regular patrol routine. Officer Dayton's routine patrol took him to the

2

parking lot of McCoy's Building Supply, where he parked and began running radar. About 9:00 p.m., while still parked in the McCoy's parking lot, Officer Dayton heard the Department's dispatcher broadcast a notice of a domestic disturbance involving a weapon on East Louisiana Street. According to Officer Dayton, the Department considers a domestic disturbance involving a weapon as the most serious of all police calls.[1] Once he learned of the disturbance, Officer Dayton activated his emergency lights and siren and began to drive toward the scene of the disturbance because he believed he might be the closest responding officer.[2]

Officer Dayton first drove along South Brooks Street, reaching speeds of forty to fifty miles per hour. He approached an intersection and observed that he had a green light. During his deposition, Officer Dayton testified that he was hitting his siren as he passed through that intersection. Officer Dayton continued on South Brooks Street and slowed his patrol car to about eight miles per hour to make a right-hand turn onto East Louisiana Street. He then accelerated his patrol

---

[1] In his affidavit attached to the City's plea to the jurisdiction, Dayton stated that when there is a disturbance with a weapon, "dispatch assigns officers to respond." An excerpt listing Department procedures for operating police vehicles in emergency conditions was also attached to the City's plea to the jurisdiction. The procedure for responding to disturbance calls provides that "emergency equipment will not be used unless there is a weapon involved. The dispatcher will advise of the situation, and whenever possible, assign two or more officers to respond." The procedure for responding to shootings and similar incidents provides that "only the unit assigned will respond with red lights and siren. Other units may respond as directed by the supervisor or dispatcher using red lights only, except where extra safety precautions are needed. Example: Intersections." There is no evidence in the record that Officer Dayton was assigned to respond to the disturbance by the dispatcher. Instead, Officer Dayton stated only that he learned of the disturbance "by monitoring the police radio" and believed he might be the closest officer responding to the disturbance.

[2] Officer Dayton testified during his deposition that his vehicle's camcorder automatically begins recording whenever the emergency lights are activated. Dayton insisted that he turned the camcorder unit on at the beginning of his shift before he left the Brazoria Police Department. It is undisputed, however, that his vehicle's camcorder did not record any part of the incident leading up to the collision with Ellis's vehicle. Dayton also testified that turning on the emergency lights and siren is a two-step process.

car as he drove east along East Louisiana. Officer Dayton estimated that he reached a speed of about thirty miles per hour as he approached the yield sign at the intersection of East Louisiana and South Market Street.

While Officer Dayton was driving east on East Louisiana, Ellis was driving north on South Market with his two daughters. As both drivers approached the intersection of East Louisiana and South Market, a large building to Officer Dayton's right blocked both drivers' views of traffic approaching the intersection.[3] Officer Dayton, who had the yield sign, did not stop his vehicle.[4] In his affidavit, Officer Dayton stated that he is not required by Texas law to stop completely at a yield sign unless safety requires it. Officer Dayton also stated that he could have stopped at the yield sign and waited to proceed through the intersection, but he "saw no need to do so based on [his] perception of traffic at the time weighed against the need for [his] prompt response to the incident involving the weapon." Officer Dayton instead started to slow his patrol car about thirty to forty feet from the intersection.

As he approached the intersection, Officer Dayton looked to his left "because [he] had a clear line of sight to [his] left." Officer Dayton then turned to his right in an effort to see past the building, and he saw Ellis's vehicle between ten and twenty feet away. Officer Dayton's patrol car crashed into the driver's side door area of Ellis's vehicle. Contradicting his earlier statement that he slowed before entering the intersection, Officer Dayton estimated that he was still travelling at approximately thirty miles per hour when he hit Ellis's vehicle. After

---

[3] According to the police report, the building was located on the southwest corner of the intersection.

[4] In his affidavit, Officer Dayton stated that he "took all reasonable precautions I could have under the circumstances to avoid an accident but apparently a building on the corner of South Market and East Louisiana prevented me from recognizing the threat posed by Mr. Ellis."

the collision, Officer Dayton's patrol car came to rest in a ditch while Ellis's vehicle stopped in a nearby yard. It was later determined that both vehicles were total losses.

Officer Dayton, who was not injured in the collision, exited his vehicle, reported the collision to his dispatcher, and called for an ambulance and fire truck. He then went to Ellis's vehicle to assist the occupants. Officer Dayton admitted that, as he approached Ellis's vehicle after the collision, he said "they're going to fire me for this." Officer Dayton initially checked on Ellis, who was already being assisted by a person who had seen the collision. Ellis asked about his children. Officer Dayton then got Ellis's children out of the vehicle and moved them away from the scene. One child had a cut and was bleeding. Officer Dayton allowed one child to use the officer's cell phone to call the children's mother. Officer Dayton did not know how Ellis got out of the vehicle because Detective Vicki Green of the Brazoria Police Department arrived within fifteen minutes of the collision and took Officer Dayton to a nearby hospital to be checked out. Officer Dayton did not speak to the Department of Public Safety (DPS) trooper investigating the collision until several days later, when he spoke with him on the telephone. The DPS trooper determined that Dayton's disregarding a yield sign as he entered the intersection contributed to the collision.

Officer Dayton did not receive a warning or reprimand from the Brazoria Police Department as a result of the collision, but he left the department less than a month later. During his deposition, Officer Dayton explained that he left due to the stress he was experiencing as a result of the lack of sleep caused by his work schedule. Officer Dayton also admitted during his deposition that if he had stopped at the yield sign before proceeding into the intersection, the collision would not have occurred.

5

Several witnesses gave voluntary statements to the DPS trooper investigating the accident. Gene Farrer, a licensed civil process server, located and interviewed three of the witnesses: Nathan Crecy, Derrick Matthew, and Breddie Matthews. All three saw the collision and none heard a siren prior to the crash.

Ellis, individually and as next friend of his minor daughters, filed this negligence suit against the City and Officer Dayton. The claims against Officer Dayton were dismissed by agreement. The City filed a plea to the jurisdiction asserting that the trial court lacked jurisdiction over the claims against it because it had not waived its governmental immunity. The City made two arguments in its plea to the jurisdiction. First, the City asserted Officer Dayton's official immunity preserved the City's governmental immunity. Second, the City argued it was immune because the emergency exception in the Texas Tort Claims Act (TTCA) barred any possible waiver of its governmental immunity.

In support of its plea to the jurisdiction, the City attached not only Officer Dayton's affidavit, but also affidavits from Detective Green and Officer Jennifer Neilon of the Pasadena Police Department. Both Detective Green and Officer Neilon accepted Dayton's testimony that he had turned on his emergency lights and his siren at the beginning of his response and kept both on up to the moment he crashed into Ellis's vehicle. Based on that testimony, both conducted a needs-versus-risk analysis and then opined that a reasonably prudent officer, in similar circumstances to those faced by Officer Dayton, could have reached the same decision he did based upon his perception of the facts at that time. The trial court denied the City's plea, and this interlocutory appeal followed.

6

## I. Standard of review

We review a trial court's ruling on a plea to the jurisdiction de novo. *City of Pasadena v. Belle*, 297 S.W.3d 525, 528 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Tex. Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004)). A defendant's plea may challenge either the plaintiffs' pleadings or the existence of jurisdictional facts. *Id.* When, as here, the governmental entity challenges the existence of jurisdictional facts, we must consider the relevant evidence submitted by the parties. *Id.* If that evidence raises a fact issue as to jurisdiction, the governmental entity's plea must be denied because the issue must be resolved by the trier of fact. *Id.* If the relevant evidence is undisputed or fails to present a jurisdictional fact issue, however, the court should rule on the plea as a matter of law. *Id.* The standard of review for a plea to the jurisdiction based on evidence generally mirrors that of a motion for summary judgment. *Quested v. City of Houston*, 440 S.W.3d 275, 280 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We therefore must credit evidence favoring the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Id.*

## II. Because there is a fact issue on whether Officer Dayton acted in good faith, the trial court properly denied the City's plea to the jurisdiction based on official immunity.

The City, as a municipality and political subdivision of the State, cannot be liable for an employee's acts unless its governmental immunity has been waived. *Belle*, 297 S.W.3d at 529 (citing *City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex. 1994)). Under the facts of this case, the only possible waiver of the City's immunity from suit and liability is found in section 101.021 of the TTCA, which provides in relevant part:

> A governmental unit in the state is liable for . . . property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:
>
> (A)    the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and
>
> (B)    the employee would be personally liable to the claimant according to Texas law . . . .

Tex. Civ. Prac. & Rem. Code Ann. § 101.021(1) (West 2011).

The parties agree Ellis's claims arise from the use of a motor vehicle. They also agree that Officer Dayton was acting within the scope of his employment when he responded to the dispatcher's call regarding a domestic disturbance with a weapon involved. The parties' dispute concerns whether Officer Dayton could "be personally liable to the claimant[s] under Texas law." The City contends the evidence conclusively shows that Officer Dayton retained his official immunity because he responded to the disturbance call in good faith. Officer Dayton therefore could not be personally liable to Ellis according to Texas law and, as a result, the City asserts that its governmental immunity has not been waived.

Official immunity is an affirmative defense, and therefore the burden rests on the City to establish all elements of that defense. *Belle*, 297 S.W.3d at 530; *see Green v. Alford*, 274 S.W.3d 5, 16 n.11 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (en banc). Under that defense, a government employee may be immune from a lawsuit that arises from (1) the performance of discretionary duties (2) in good faith, (3) provided he was acting in the course and scope of his authority. *Id.* In the City's first issue, only good faith is in dispute.

In this context, "good faith" is defined as a standard of objective legal reasonableness that disregards the police officer's subjective state of mind. *Belle*,

297 S.W.3d at 530 (citing *Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997)).  The defendant has the burden to prove conclusively that a reasonably prudent police officer, under the same or similar circumstances, could have believed his actions were justified based on the information he possessed at the time.  *Id.*; *City of Lancaster*, 883 S.W.2d at 656–57.  To rebut a defendant's showing of good faith, a plaintiff must establish that no reasonable person in the officer's position could have thought the facts were such that they justified the officer's actions.  *Id.*

The good-faith standard of reasonableness is subject to a balancing test that weighs the *need* for the officer's actions against the *risks* entailed by such conduct based on the officer's perception of the facts at the time of the event.  *Wadewitz*, 951 S.W.2d at 467.  The need aspect of the balancing test refers to the urgency of the circumstances requiring police intervention and requires an evaluation of the following factors: (1) the seriousness of the crime or accident to which the officer is responding; (2) whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect; and (3) what alternative courses of action, if any, are available to achieve a comparable result.  *Id.*  The risk aspect refers to the countervailing public safety concerns and requires an evaluation of the following factors: (1) the nature and severity of the harm the officer's actions could cause (including injuries to bystanders as well as the possibility that the officer may not reach the scene of the original emergency); (2) the likelihood that any harm would occur; and (3) whether the risk of harm would be clear to a reasonably prudent officer.  *Id.*

To prevail, a defendant's proof must sufficiently address these need/risk factors.  *Telthorster v. Tennell*, 92 S.W.3d 457, 462 (Tex. 2002).  An expert giving testimony regarding good faith must discuss what a reasonable officer could have

believed based on the officer's perception of the facts at the time of the event, and this discussion must be substantiated with reference to both the "need" and "risk" aspects of the balancing test. *Belle*, 297 S.W.3d at 531 (citing *Wadewitz*, 951 S.W.2d at 466–67). In addition, the facts of the case may require the expert to provide a continuing assessment of the "need" and "risk" factors because emergency responses and police pursuits may involve rapidly changing circumstances. *Id.* (citing *University of Houston v. Clark*, 38 S.W.3d 578, 582–83 (Tex. 2000)).

A reviewing court analyzing these factors must first determine whether the governmental unit met its initial burden to prove conclusively the police officer's good faith. Only when it has been determined that the governmental unit met this burden does the court address whether the nonmovant's evidence raises a genuine issue of material fact on the issue of good faith. *Id.*

We therefore turn to the question whether the City met its burden to prove Officer Dayton's good faith conclusively. As this Court has held, an opinion that an officer acted in good faith does not conclusively establish good faith when the opinion is reached "by assuming the truth of disputed facts . . . and by failing to consider other uncontroverted facts." *Green*, 274 S.W.3d at 20. In this case, the City's evidence of good faith contains each of these flaws.

As to uncontroverted facts, there is no dispute that as Officer Dayton approached the yield sign at the intersection of East Louisiana and South Market, a large building blocked his view of traffic approaching from his right that did not face a yield sign. It is also undisputed that Officer Dayton did not stop his vehicle at the yield sign and verify that the way was clear before proceeding into the intersection. When faced with a yield sign, a motorist is required to stop and yield the right of way and may proceed through the intersection only when it is safe to

do so. *See* Tex. Transp. Code Ann. § 545.151(a) (West 2011). Although police officers are sometimes allowed to violate traffic laws, they may do so only when it is safe. *See id.* § 546.001 (authorizing police officer to proceed through stop sign after slowing as necessary for safe operation).

These changing circumstances required a continuing assessment of the need and risk factors. *Belle*, 297 S.W.3d at 531; *see also Clark*, 38 S.W.3d at 582–83; *Green*, 274 S.W.3d at 18–20 (addressing intersection where accident occurred as part of need/risk analysis); *Harris County v. Smyly*, 130 S.W.3d 330, 335 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("an officer is required to assess the specific circumstances present that affect any risks"). One of the need factors is alternative courses of action that are available to achieve a comparable result. *Belle*, 297 S.W.3d at 532. Additionally, one of the risk factors is the harm that a police officer's actions could cause, including the possibility that the officer may not reach the scene of the original emergency. *Wadewitz*, 951 S.W.2d at 467.

Officer Dayton and the City's experts failed to address how the need and risk factors were affected by the building blocking Officer Dayton's view. Officer Dayton stated in his affidavit that he considered stopping at the yield sign before entering the intersection, but he "saw no need to do so based upon [his] perception of traffic at the time weighed against the need for [his] prompt response to the incident involving a weapon." He claimed that he "took all reasonable precautions," but "apparently" the building prevented him from seeing Ellis's vehicle. This testimony does not conclusively prove objective good faith because it does not address the "degree, likelihood, and obviousness of the risks created by" Officer Dayton's decision to proceed through a yield sign despite his obstructed view. *See Wadewitz*, 951 S.W.2d at 466–67 (holding evidence that failed to address risk of crossing lane obscured by truck did not provide basis for

11

concluding that reasonable officer could have believed actions were justified). Nor does the testimony address the extent to which alternative actions—such as stopping briefly or slowing further—might have impacted Officer Dayton's ability to respond timely to the disturbance call. *See Belle*, 297 S.W.3d at 534 (holding evidence did not conclusively demonstrate good faith where it failed to address availability of alternative manner of response).

The City's expert witnesses simply repeated Officer Dayton's statements regarding his consideration of traffic conditions as he approached the blind intersection of East Louisiana and South Market, and they failed even to mention his blocked field of vision when rendering their opinions. Expert witnesses' opinions must be based on the reality of the situation facing the police officer. *See Collins v. City of Houston*, 14-13-00533-CV, 2014 WL 3051231, at *6 (Tex. App.—Houston [14th Dist.] July 3, 2014, no pet.) (mem. op.) (holding city failed to establish conclusively that police officer acted in good faith because expert witnesses did not offer opinions based on specific circumstances officer faced). On this record, therefore, the City failed to establish conclusively that Officer Dayton acted in good faith in proceeding through a yield sign at a blind intersection.

The City's evidence of good faith is also inconclusive for a second, independent reason: it assumes the truth of the disputed fact that Officer Dayton was using his siren as he approached the intersection. Officer Dayton testified that he was using his siren continuously from the beginning of his response to the emergency situation, but there was other evidence in the record that he was not. This evidence included his own testimony that he was hitting his siren as he passed through an earlier intersection, which could support an inference that he was using his siren not continuously but only intermittently. There are also reports from

witnesses that they observed the collision and saw Dayton's emergency lights but did not hear a siren prior to the collision.[5]

All three of the City's police officer witnesses—Dayton, Green, and Neilon—included a needs-versus-risk analysis in their affidavits, and all concluded that Officer Dayton acted in good faith. All based their conclusion, in part, on evidence that Officer Dayton was using his siren continuously as he entered the intersection of East Louisiana and South Market. None formed their good-faith opinion based on a need-versus-risk analysis under the alternative scenario that Officer Dayton was not using his siren when he entered the intersection. Because they did not do so, and there is evidence in the record that Dayton was not using his siren when he entered the intersection, the City has not conclusively demonstrated that Officer Dayton acted in good faith. *See Smyly*, 130 S.W.3d at 335 ("When material facts underlying an officer's claim of good faith are contradicted, a conclusive finding of good faith is precluded and summary judgment is improper."); *see also Collins*, 2014 WL 3051231, at *6 (holding opinions failed to establish good faith because they "relie[d] on assumptions that are not supported by the record"); *Junemann v. Harris County*, 84 S.W.3d 689, 694–95 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (holding that when officer's failure to activate lights was disputed, testimony that did not evaluate risks associated with failure to activate lights was insufficient to establish good faith conclusively).[6]

---

[5] The City argued on appeal that we cannot consider Farrer's report of the witnesses' statements that they did not hear a siren because it contains hearsay. Because the City failed to obtain explicit rulings on any hearsay objection it may have lodged to Farrer's report, we conclude we can consider the report in resolving this appeal. *See Quested*, 440 S.W.3d at 284 n.19.

[6] *Cf. City of San Angelo v. Hudson*, 179 S.W.3d 695, 700–01 (Tex. App.—Austin 2005, no pet.) (holding good faith conclusively proven where undisputed evidence established fire

For these reasons, we hold the trial court did not err when it denied the City's plea to the jurisdiction asserting that the City's governmental immunity has not been waived under section 101.021. We overrule the City's first issue.

### III. There is a fact issue on whether the emergency exception to the TTCA's waiver of immunity applies and as a result, the trial court correctly denied the City's plea to the jurisdiction based on this exception.

In its second issue, the City contends that even if it failed to negate conclusively the possibility that its governmental immunity has been waived under section 101.021, the trial court erred in denying the plea to the jurisdiction because the emergency exception to that waiver applies. The City argues that it established as a matter of law that Officer Dayton did not act recklessly and Ellis's evidence did not create a genuine issue of material fact on that issue. We disagree.

The TTCA includes a subchapter entitled "Exceptions and Exclusions" that lists circumstances in which a waiver of immunity does not apply. *City of San Antonio v. Hartman*, 201 S.W.3d 667, 671–72 (Tex. 2006). One of the exceptions addresses emergency situations. This exception provides that the TTCA "does not apply to a claim arising . . . from the action of an employee while responding to an emergency call or reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action, or in the absence of such law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others . . . ." Tex. Civ. Prac. & Rem. Code Ann. § 101.055(2) (West 2011).

The law applicable here is found in section 546.005 of the Texas

truck was using emergency lights, siren, and air horn as it approached intersection and driver testified he was driving below speed limit, considered stopping at intersection but, after looking both ways and observing that traffic had yielded to his fire truck and evaluating need for a prompt response to emergency, decided not to stop completely but instead to slow down significantly before entering intersection).

14

Transportation Code, which provides that a driver of an emergency vehicle is not relieved of "the consequences of reckless disregard for the safety of others." *Smith v. Janda*, 126 S.W.3d 543, 545 (Tex. App.—San Antonio 2003, no pet.) (quoting Tex. Transp. Code Ann. § 546.005). Therefore, a governmental entity is immune from suits to recover damages resulting from the emergency operation of an emergency vehicle unless the operator of the vehicle acted recklessly by an act or omission the operator knew or should have known posed a high degree of risk of serious injury. *Green*, 274 S.W.3d at 22. The plaintiff has the burden of presenting some evidence that the emergency exception does not apply. *Quested*, 440 S.W.3d at 284.

Here, Officer Dayton's affidavit and testimony established that he was subjectively aware that he lacked a clear field of view to his right and that proceeding through a yield sign without stopping first increases the risk of a collision. In addition, we already have explained that there is a factual dispute regarding whether Officer Dayton was using his siren as he approached the blind intersection of East Louisiana and South Market. Non-use of a siren under this scenario could support a finding that Officer Daytonacted recklessly in deciding to drive through the yield sign without stopping first. *See City of Missouri City v. Passante*, No. 14-09-00634-CV, 2010 WL 2998777 *8 (Tex. App.—Houston [14th Dist.] Aug. 3, 2010, no pet.) (affirming trial court's denial of plea to jurisdiction because there were fact issues on whether police officer was reckless when there were also fact issues on whether officer (1) was using his emergency lights and siren, (2) had the green light at the intersection where he collided with another vehicle, and (3) could not see cross-traffic at the intersection); *Belle*, 297 S.W.3d at 535 (affirming trial court's denial of plea to jurisdiction because there was fact issue on whether police officer was reckless when he responded to emergency call

15

by traveling twice the speed limit without operating emergency lights or siren); *Green*, 274 S.W.3d at 29 (concluding firefighter's failure to use siren as he drove fire engine across lane he could not see was factor supporting finding that firefighter was reckless).

The City cites two cases in support of its argument that the emergency exception applies and its governmental immunity is preserved, but we conclude that both are distinguishable. In particular, the City contends that the court of appeals in *City of San Angelo v. Hudson* rejected a claim of recklessness on virtually identical facts. 179 S.W.3d 695 (Tex. App.—Austin 2005, no pet.). The City overstates the similarities between *Hudson* and the present case. In *Hudson*, unlike here, it was undisputed that the emergency vehicle was using its emergency lights, siren, and air horn as it approached and entered the intersection where the collision occurred. *Id.* at 701. *Hudson* is also distinguishable because the emergency vehicle driver's actions as he approached the intersection demonstrated a concern for the welfare of other motorists not shown here. In *Hudson*, the driver testified that as he approached the intersection, he was driving below the speed limit and he considered stopping but, after looking both ways and observing that traffic had yielded to his fire truck while also evaluating the need for a prompt response to the emergency, he decided not to stop completely but instead only to slow down significantly before entering intersection. *Id.* at 700–01. Here, in contrast, it is not clear that Officer Dayton analyzed the risk posed by his obstructed view or slowed his car as he approached and entered the intersection.

The second case cited by the City, *City of Pasadena v. Kuhn*, is also distinguishable because the evidence was undisputed that the emergency vehicle involved was using its emergency lights and siren before entering the intersection where the collision occurred. 260 S.W.3d 93, 100 (Tex. App.—Houston [1st Dist.]

16

2008, no pet.).  Thus, neither *Kuhn* nor *Hudson* supports applying the emergency exception here.

Because there is a fact issue on whether Officer Dayton's conduct was reckless, we overrule the City's second issue.  *Belle*, 297 S.W.3d at 534–35; *see Green*, 274 S.W.3d at 26–27.  Having overruled the City's first two issues challenging the trial court's denial of its plea to the jurisdiction, we need not reach the City's third issue regarding whether it waived its governmental immunity by filing a counterclaim against Ellis.  *See* Tex. R. App. P. 47.1.

CONCLUSION

Having addressed and rejected each issue raised by the City necessary for a final disposition of this appeal, we affirm the trial court's denial of the City's plea to the jurisdiction and remand this case to the trial court for further proceedings consistent with this opinion.

/s/    J. Brett Busby
   Justice

Panel consists of Chief Justice Frost and Justices Christopher and Busby.